IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| --- | --- | --- |
| v. | : | No. 09-20 |
| GELEAN MARK and JEROME BLYDEN | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                           December 28, 2009

       Jerome Blyden seeks to suppress evidence recovered by officers during a protective sweep of his home following his arrest outside the doorway of his residence. He further asks this Court to exclude any evidence found pursuant to a search warrant issued based on evidence uncovered during the unconstitutional search. Because the search exceeded the scope of the officers' authority under the Fourth Amendment, Blyden's motion to suppress is granted.

**FINDINGS OF FACT**

1. On May 19, 2009, an arrest warrant was issued for Blyden, charging him with racketeering, violence in aid of racketeering, and the use of a firearm in the commission of a drug crime.

2. On May 20, 2009, at about 6:30 a.m., federal agents arrived at the home Jerome Blyden shared with his girlfriend, Jessica Farrell, to conduct surveillance prior to the execution of a federal arrest warrant for Blyden. At that time, the officers observed a metallic Honda parked in front of the residence. At about 9:30 a.m., Farrell left the residence in

the metallic Honda, but the officers conducting surveillance did not observe her departure.

3. At approximately 10:23 a.m., Federal Bureau of Investigation (FBI) Special Agent Jackson Purkey placed a phone call to Blyden's home, but hung up after Blyden answered. Blyden returned Agent Purkey's phone call, and Agent Purkey revealed his identity. He informed Blyden he sought to execute an arrest warrant. He asked Blyden if he was home alone, and Blyden answered in the affirmative. Agent Purkey then requested Blyden exit the residence. Blyden, who was then partially dressed in his bedroom, agreed. Approximately nine agents were present at the Blyden residence at this time.

4. Immediately after hanging up, Blyden put on denim cargo shorts and flip flops. He walked into his home office, which had a window facing the street. He pulled back curtains and saw the officers gathered in front of his residence. Drug Enforcement Administration (DEA) Special Agent Andrew Arthurton and Agent Purkey saw a figure resembling Blyden in the window, and gestured for him to come downstairs. Less than one minute after pulling back the blinds, Blyden exited the residence as requested. He was arrested immediately outside the front door of his residence. Blyden cooperated fully with the arrest. While being placed in handcuffs, an officer again asked Blyden if he was home alone. Blyden again responded in the affirmative.

5. There was no evidence Jessica Farrell, if home, would have posed a danger to the arresting officers. The officers did not believe she was a co-conspirator, had a history of violence, or had a criminal record. The officers had no reason to believe anyone other than Blyden and Farrell were present in the Blyden residence.

6. After handcuffing Blyden, approximately five officers entered the residence and conducted a protective sweep of the front yard and back yard areas. These officers did not see or hear anything to indicate another person or a canine was in the home. Nonetheless, Drug Enforcement Administration (DEA) Special Agent David Parkhurst and Agent Purkey proceeded upstairs to the second floor of the residence.

7. During their search of the second floor of the residence, Agents Parkhurst and Purkey entered the home office. This room contained a closet and a clear glass desk with a computer on top. The screen of the computer was placed perpendicular to the doorway of the room, and could not be seen from the hallway. The area underneath the desk was clearly visible from the hallway. The agents did not observe anyone underneath the desk.

8. Agent Parkhurst opened the closet door and confirmed no one was present inside the closet. Agent Purkey walked around the desk and observed the screen of Blyden's personal computer, which was placed perpendicular to the doorway of the room. Agent Purkey walked closer to the computer and read the contents of a document entitled "Gift Letter," which purported to transfer the sum of $93,000. No persons were found during the course of the agents' search.

9. After the search of the second floor, Blyden was led back into his home. He was allowed to drink a glass of water and to put on a different pair of shoes. Soon thereafter, he was led to an officer's vehicle and removed from the scene.

10. The same day, Agent Purkey obtained a search warrant for Blyden's residence based on the contents of the "Gift Letter."

**CONCLUSIONS OF LAW**

Blyden asserts the search of his residence incident to his arrest was unconstitutional because he had already exited his home voluntarily and the officers had no reason to suspect a person inside the home would pose a danger to them.

Warrantless searches "are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (citation and internal quotation marks omitted). The Supreme Court created such an exception in *Maryland v. Buie*, allowing officers effecting an arrest to conduct a "protective sweep" of the premises to ensure the officers' safety. 494 U.S. 325 (1990). The rule enunciated in *Buie* attempted to balance Fourth Amendment considerations with recognition of the fact police officers may be placed in dangerous, life-threatening situations when conducting an arrest. *See United States v. Colbert,* 76 F.3d 773, 778 (6th Cir. 1996). The *Buie* Court authorized two types of searches. First, when an arrest occurs within a residence, officers may search spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Second, a more pervasive search of the home may be allowed when officers can point to "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. The government concedes the search here, which involved a sweep of the second floor when Blyden was detained outside the home, falls into the second type of search authorized by *Buie*.

The "protective sweep" exception to the warrant requirement is narrow, allowing only "a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. While *Buie* does not specifically address an arrest made outside a suspect's home, there is agreement among circuits that the mere fact the arrest occurs outside a residence does not, in itself, forbid a

4

protective sweep when it is reasonably necessary for the protection of the officers. *See United States v. Lawlor*, 406 F.3d 37, 41 (1st Cir. 2005); *United States v. Cavely,* 318 F.3d 987, 995-96 (10th Cir. 2003); *United States v. Wilson,* 306 F.3d 231, 238 (5th Cir. 2002); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1999); *United States v. Colbert,* 76 F.3d 773, 776-77 (6th Cir. 1996); *United States v. Henry,* 48 F.3d 1282, 1284 (D.C. Cir. 1995); *United States v. Oguns,* 921 F.2d 442, 446 (2d Cir. 1990). Indeed, the Third Circuit has expressly recognized that "in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers." *Sharrar*, 128 F.3d at 824 (quoting *Colbert*, 76 F.3d at 776). In determining whether a sweep is necessary to ascertain if a dangerous third person is present, it is irrelevant to consider the nature of the crime, the character of the arrestee, or whether the arrestee himself is armed. *Id.* at 825 (citing *Colbert*, 76 F.3d at 777). Instead, the officers must consider the dangerousness of any potential third party, because the "arrestee's dangerousness is irrelevant to the protective sweep analysis once the arrestee is in custody." *Id.* (citing *Colbert*, 76 F.3d at 777 ("The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual.")).

The government first argues the officers were justified in conducting a sweep of the second floor because they had evidence another person remained in the home, pointing to the fact the officers observed movement in the office window before the arrest and the fact the officers conducting surveillance did not see Farrell leave. Neither of these assertions are facts which would lead a reasonable officer to believe the office contained a person who would pose a danger to the officers on the scene. Whether or not the arresting officers recognized Blyden when he peered out the window, Agents Arthurton and Purkey testified when they waved at the

5

person in the window to come downstairs, he came to the front door within seconds. All the parties agree the person who came to the door was Blyden, the target of the arrest warrant. Thus, there is no reasonable basis to believe the person in the window was someone other than Blyden.

Regarding the potential presence of Farrell, no officer testified they believed Farrell posed a danger to them. Farrell was not indicted as a co-conspirator, and no officer was aware of any history of violence or a criminal record. Moreover, there is scant evidence to demonstrate it was reasonable for the officers to believe Farrell was at home during the time of the arrest. Blyden's residence was under surveillance from 6:30 a.m. until the time of his arrest, during which time Farrell left for work in her car, the metallic Honda which had previously been observed parked in front of the home. Although the surveilling agents appear to have missed Farrell's exit, the absence of her vehicle, which had been parked in front of the residence, should have been clear. If the officers truly believed Farrell was a dangerous person, it seems reasonable they would have taken some steps to ascertain whether she was present before approaching the house to arrest Blyden. Further, Blyden was twice asked if he was alone, and twice he answered in the affirmative. It is true the arresting officers were not required to rely on Blyden's word regarding the absence of other persons in the residence. *See Sharrar*, 128 F.3d at 824 (holding that arresting officers need not accept the word of a suspect in determining whether a sweep is necessary to ensure no dangerous person remains inside a residence) (citing *Oguns*, 921 F.2d at 446-47). However, given Blyden's cooperation with law enforcement during the course of his arrest, his assertions had some indicia of reliability. Without any evidence to contradict Blyden's statements, there was no reason for officers to believe Farrell was home and posed a danger to the officers.

The government next contends the sweep was justified based on the "fact of the unknown," because when conducting home arrests officers are faced with the "inherent danger of what might happen." This justification for a protective sweep is insufficient under *Buie*, because to allow a sweep whenever officers have no basis to know whether a third party is present would allow the *Buie* exception to the warrant requirement to essentially override the need for a search warrant in all circumstances involving an arrest conducted in the suspect's home. *See United States v. Carter*, 360 F.3d 1235, 1243 (10th Cir. 2004) ("[T]here could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*."); *Colbert*, 76 F.3d at 778 ("[A]llowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit command in *Buie* that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home."). As the Third Circuit explained in rejecting the use of a protective sweep when there was no reason to believe people remained inside the home, "'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Sharrar*, 128 F.3d at 825 (quoting *Colbert*, 76 F.3d at 778).

Even if the Court were to find the officers were justified in conducting a protective sweep of the second floor of Blyden's residence—and it does not—the scope of the search went beyond the "cursory visual inspection of those places in which a person might be hiding" authorized by *Buie.* 494 U.S. at 327. This type of search "is a quick and limited search of premises," meant only to "protect the safety of police officers or others." *Id.* When searching Blyden's office, Agent Purkey approached Blyden's computer not to ascertain whether a dangerous person was

7

hiding within the computer, but to read the words on the computer screen.  This exceeds the bounds of a protective sweep; therefore, Agent Purkey did not view the computer screen from a lawful vantage point such that the search would be allowable under the "plain view" doctrine. *See United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (holding the plain view doctrine "is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest is lost").

The exclusionary rule requires the exclusion of all evidence secured as a result of an unconstitutional search.  *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002).  Because Agent Purkey did not have the right to read the "Gift Letter" on Blyden's computer, the search warrant issued pursuant to Agent Purkey's affidavit must be invalidated, and all evidence obtained as a result must be suppressed.

An appropriate order follows.